CHRISTINA A., by and through her Parent and Next Friend, JENNIFER A., et al., Plaintiffs,

v.

Jeff BLOOMBERG, in his official capacity as Secretary of the South Dakota Department of Corrections; and Owen Spurrell, in his official capacity as Superintendent of the State Training School, Defendants.

No. CIV. 00–4036.

United States District Court,
D. South Dakota,
Southern Division.

Sept. 28, 2001.

Wally Eklund, Charles Rick Johnson, Stephanie E. Pochop, Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, SD, Mark I. Soler, Marc A. Schindler, Michael Finley, Washington, DC, for Plaintiff.

James E. Moore, William G. Beck, Woods, Fuller, Shultz & Smith, James E. McMahon, Boyce, Murphy, McDowell & Greenfield, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Plaintiffs have filed a Motion for Attorneys' Fees and Costs following the settlement of this class action lawsuit. Plaintiffs request fees and costs for services performed from January 2000 through December 2000. For the reasons stated below, the Motion for Attorneys' Fees and Costs is granted in part and denied in part.

## BACKGROUND

Plaintiffs filed this action seeking declaratory and injunctive relief. Plaintiffs alleged that the conditions of confinement and the policies, practices, acts and omissions at the State Training School, Juvenile Prison, Female Secured Unit, and the Girls Intensive Program in Plankinton, South Dakota, denied them their due process rights under the First and Fourteenth Amendments. Plaintiffs also claimed that Defendants deprived them of special education and related services to which they were entitled under the Individuals with Disabilities Education Act ("IDEA"). Specifically, Plaintiffs claimed:

- that Defendants used mechanical restraints when such restraints are excessive and unreasonable, through, for example, "four-pointing"(Compl.¶ 30) and "bumpering" (Compl.¶ 32);
- that female Plaintiffs had been four-pointed and then forcibly stripped with the participation of male staff members (Compl.¶ 31);
- that Defendants used excessive force during "cell extractions" (Compl.¶ 33);
- that Plaintiffs were put in lockdown or isolation for arbitrary reasons, for purposes of punishment and for excessively long periods of time (Compl.¶¶ 36–37);
- that there was no procedure by which qualified individuals could decide if and how long a Plaintiff needed to be in isolation (Compl.¶ 38);
- that the conditions of confinement in the isolation or crisis cells, including lack of counseling and education, violated Plaintiffs' rights (Compl.¶¶ 37–38);
- that Plaintiffs were subject to an "arbitrary and punitive disciplinary system" and that there was no procedural due process for disciplinary violations (Compl.¶¶ 39–43);
- that Plaintiffs were subject to a "table program" where Plaintiffs were required to sit at a table for over two days without speaking (Compl.¶ 44);
- that these arbitrary disciplinary procedures and determinations prevented Plaintiffs from successfully completing any of the programs at Plankinton because male Plaintiffs were routinely transferred from the Training School to the Juvenile Prison for these disciplinary infractions (Compl.¶¶ 35, 45);
- that Plaintiffs who suffered from mental illnesses could not meet the disciplinary requirements and were therefore repeatedly sent to isolation which was particularly harmful to these Plaintiffs (Compl.¶ 46);
- that Defendants provided inadequate mental health care for Plaintiffs in need of such care (Compl.¶¶ 54–60);
- that female Plaintiffs were subject to an invasion of privacy as a result of the presence of male staff in the shower area (Compl.¶ 47);
- that the staff at Plankinton was inadequately trained and supervised (Compl.¶¶ 49–50);
- that Plaintiffs' First Amendments rights of privacy and association were violated by the monitoring of calls and visits with family and the reading and censoring of Plaintiffs' mail (Compl.¶¶ 51–53);

- that Defendants provided Plaintiffs with an inadequate education generally (Compl.¶ 61); and
- that the rights of Plaintiffs with special educational needs under IDEA were violated by the inadequate provision of special education for those in need (Compl.¶¶ 62–67).

On November 6, 2000, after several months of extensive discovery, the parties reached a settlement. The Court held a Fairness Hearing on December 11, 2000. On December 13, 2000, pursuant to Federal Rule of Civil Procedure 23(e), the Court approved the Settlement Agreement and specifically retained jurisdiction over the matter for purposes of enforcing the Settlement Agreement.

The Settlement Agreement deals with most of the violations alleged in the Complaint. The Settlement Agreement provides several benefits to Plaintiffs with regard to the use of restraints. For example, fixed restraints may not be used for any minimum set period of time. In the case of self-injurious or suicidal youth, if restraints are necessary, non-fixed restraints must first be used with fixed restraints being used only after consultation with a mental health clinician. In addition, the Defendants are required to remove all the metal rings used for restraints from the beds in all the units with the exception of three beds in the Female Secure Unit. Under the agreement, Defendants also will not use restraints when escorting youth to and from their cells except in the extreme situation of aggressive or assaultive behavior. Defendants will also not maintain "less than lethal" devices inside Plankinton's fence perimeter except when approval is given during a major disturbance. The Settlement Agreement also provides that Defendants will videotape for one year all incidents in which youth are placed in restraints and provides for the maintenance and review of reports regarding the use of restraints.

The Settlement Agreement also contains provisions relating to the amount of mental health care available to the children at Plankinton. The agreement provides for a minimum of 100 hours per week of clinical mental health services, which will include two full-time mental health clinicians. In addition, the Settlement Agreement also provides for 16 hours a month of psychiatric care. For self-injurious and suicidal youth, the agreement calls for face-to-face intervention during normal business hours and monitoring of those youths by mental health clinicians. Some concern was raised by the South Dakota Coalition for Children that face-to-face intervention would not be available at night or on the weekends when incidents involving suicidal behavior often occur. Plaintiffs' attorneys believe, however, that a mental health clinician will be on call during non-business hours and that at least one mental health clinician lives nearby.

The procedures by which youth are placed in cell confinement and the conditions of that confinement are also governed by the Settlement Agreement. Among other things, a youth may only be confined for as long as he or she maintains any violent or dangerous behavior. A youth may only be confined for 72 hours (with a review of that confinement occurring every 24 hours) prior to a hearing. While a youth is confined to a cell, Defendants will authorize staff to enter the cell to speak with the youth. Also, during a room restriction the youth will have visual contact with a staff member every 15 minutes. Thus, the Settlement Agreement appears adequately to deal with many of the due process and confinement issues discussed in the Complaint.

Defendants also agreed to provide general and special education services that

comply with state law and IDEA. The staff at the facility will be trained annually in many areas that, according to Plaintiffs' attorneys, are consistent with the recommendations by both Plaintiffs' and Defendants' experts. Further, Defendants will put into place policies that will safeguard the privacy of the youths' correspondence and phone conversations. The Settlement Agreement also provides for a one-year monitoring period during which Plaintiffs' attorneys and their experts will make quarterly visits to Plankinton to interview youth and inspect records.

Some issues are absent from the Settlement Agreement. Notably, the Settlement Agreement does not impose an outright ban on four-pointing. It also does not deal with the allegations of bumpering, inappropriate transfers between cottages and the Juvenile Prison, or violations of the privacy of female youth by male staff members.

## DISCUSSION

The Court's analysis begins with 42 U.S.C. § 1988. Under section 1988, "[i]n any action or proceeding to enforce a provision of section[ ] ... 1983, ... the court, in its discretion, may allow the prevailing party, ... a reasonable attorney's fee as part of the costs." The award of attorney's fees under 1988 has been modified to a degree by the Prison Litigation Reform Act (PLRA), specifically section 803 of the PLRA, codified at 42 U.S.C. § 1997e(d). Section 1997e creates additional requirements that Plaintiffs must meet and then ultimately limits the amount of fees Plaintiffs may receive. The parties disagree on whether Plaintiffs are a prevailing party and on the applicability of the PLRA.

### A. Prevailing Party Status

Defendants argue that Plaintiffs cannot be deemed a prevailing party under the Supreme Court's recent opinion, *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). In *Buckhannon*, the Supreme Court rejected the "catalyst theory," holding that a plaintiff was not a "prevailing party" for purposes of section 1988 where the desired result was achieved "because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at ——, 121 S.Ct. at 1838. Defendants are correct that Plaintiffs have relied on the catalyst theory in their brief, which was submitted months before the decision in *Buckhannon*. However, *Buckhannon* does not foreclose Plaintiffs from being deemed a prevailing party.

■ In order to be a prevailing party, it is necessary for Plaintiffs to show that the resolution of the case created a " 'material alteration of the legal relationship of the parties.' " *Buckhannon*, 532 U.S. at ——, 121 S.Ct. at 1840. A voluntary change by the defendant, the Supreme Court determined, is not enough to turn a plaintiff into a prevailing party because it "lacks the necessary judicial *imprimatur* on the change." *Id.* Enforceable judgments and court-ordered consent decrees, however, create the necessary change in the legal relationship between the parties. *Id.*

■ The Settlement Agreement in this case is not a formal consent decree. But to read *Buckhannon* to require one particular form for resolving a dispute in order to become a prevailing party is to read the opinion too narrowly. Further, as another court has noted, such an interpretation would imply too narrow a definition of consent decree. *See Johnny's IceHouse, Inc. v. Amateur Hockey Assoc. of Illinois*, 2001 WL 893840 at *3 (N.D.Ill. Aug.7, 2001). As the Supreme Court noted, a consent decree often does not include an admission of liability, but it is a court-ordered change in the relationship be-

tween the parties. *Id.* The Settlement Agreement in this case serves essentially the same purpose. The Settlement Agreement requires Defendants to make certain improvements at Plankinton and allows Plaintiffs to enforce those changes within a year. In its Order dated December 13, 2000, this Court expressly retained jurisdiction over this matter for the purpose of enforcing the Settlement Agreement. Thus, unlike a voluntary change undertaken by a defendant, the changes embodied in the Settlement Agreement do not lack "the necessary judicial *imprimatur.*" As a result, Plaintiffs should be found to be a prevailing party for purposes of section 1988.

## B. *PLRA*

■ The limitations on attorney fees in § 803 of the PLRA apply "to any action brought by a prisoner who is confined to any jail, prison, or other correctional facility." 42 U.S.C. § 1997e(d)(1). Plaintiffs concede that they are "prisoners" within the meaning of this section. They argue, however, that the State facility at Plankinton is not a "jail, prison, or other correctional facility" as that phrase is used in § 803.

Whether Plankinton is deemed a "jail, prison, or correctional facility" under § 1997e depends mainly upon which statutory definition applies. In a provision which pre-dates the PLRA, 42 U.S.C. § 1997 defines an "institution" to include both a "jail, prison, or other correctional facility" and a facility or institution for juveniles "who are adjudicated delinquent [or] in need of supervision." This provision applies to the subchapter of the United States Code that includes § 1997e, the section of the Code that was modified by § 803 of the PLRA. By treating juvenile facilities separately, it implicitly excludes such facilities from the phrase "jail, prison, or other correctional facility." *See Alex-*

*ander S. v. Boyd,* 113 F.3d 1373, 1383 (4th Cir.1997).

Section 802 of the PLRA, however, contains a different definition. The list of definitions n § 802(g) provides, in pertinent part:

As used in this section -

\* \* \* \* \* \*

(5) the term "prison" means any Federal, State, or local facility that incarcerates or detains juveniles or adults accused of, convicted or, sentenced for, or adjudicated delinquent for, violations of criminal law.

18 U.S.C. § 3626(g)(5). Clearly, if this definition applies, a "jail, prison, or other correctional facility" must be interpreted to include a juvenile facility such as Plankinton.

Of these two definitions, the definition in 42 U.S.C. § 1997 is the better fit. By the express terms of § 802(g), its definition of "prison" expressly applies only as the term is used in § 802 (18 U.S.C. § 3626); it says nothing about whether the definition applies to terms as they are used in § 803 (42 U.S.C. § 1997e). When Congress inserted the provisions of § 803 into 42 U.S.C. § 1997e, section 1997e was already covered by its own set of definitions. Those definitions—set forth in 42 U.S.C. § 1997—continue to apply to the entire subchapter that includes § 1997e. Nothing in the PLRA suggests that Congress did not intend for the definitions in § 1997 to continue to govern the new provisions in § 1997e.

As the Defendants point out, the Fourth Circuit has reached a different result. In *Alexander S. v. Boyd, supra,* the Fourth Circuit held that the definition of "prison" in § 802 of the PLRA applies to the provisions of § 803. The decision in *Alexander S.* was based principally on the canon of statutory construction that "statutes which

are originally part of the same Act should be construed together." *Alexander S.,* 113 F.3d at 1383–84. The problem with the panel opinion in *Alexander S.* is its failure to take into account the structure of the PLRA. This structure makes it unsafe to assume that a term defined in one section of the PLRA necessarily has the same definition in another. In enacting the PLRA, Congress overhauled a whole host of statutes, some of which, like § 1997e, were already governed by separate statutory definitions. As noted above, the definitions in § 802 expressly apply only to 18 U.S.C. § 3626. There is little reason to conclude that Congress, in amending 18 U.S.C. § 3626, intended to override existing statutory definitions in 42 U.S.C. § 1997e. Indeed, by using the phrase "jail, prison, or other correctional facility" in 1997e, Congress adopted the terminological framework established in § 1997.

Under that framework, the youths at Plankinton are not prisoners in a "jail, prison, or other correctional facility." If Congress had wanted the fee-restricting provisions of § 1997e to apply to such youths, it could simply have made those provisions apply to prisoners in "institutions," which § 1997 defines to include juvenile facilities. In addition, an interpretation of "jail, prison, or other correctional facility" that includes juvenile facilities would render portions of the definition of institution as surplusage; for that reason, such an interpretation must be rejected. Thus, under the definitions set forth in 42 U.S.C. § 1997, which apply to § 1997e, the fee-restricting provisions of the PLRA do not apply to the Plaintiffs' fee request in this case.

## C. *Calculation of Attorney Fees and Costs*

 The starting point for a determination of attorney fees is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Section 1988 contemplates compensation not only for attorney fees, but also for litigation expenses such as copying expenses, telephone bills, and necessary travel. *See Daly v. Hill,* 790 F.2d 1071, 1083 (4th Cir.1986). The total reimbursement requested by the Plaintiffs is $393,525 in fees and $75,416.48 in litigation expenses.

The hourly rates requested by the Plaintiffs vary from attorney to attorney, and between attorneys, paralegals, law students, and a "youth advocate" employed by Plaintiffs' counsel. The requested rates are as follows:

| Attorney | Rate | Paralegal | Rate |
|---|---|---|---|
| Mark Soler | $340 | Mamie Yee | $90 |
| Marc Schindler | $200 | | |
| Michael Finley | $160 | Law Student | Rate |
| Rick Johnson | $150 | Renee Dupree | $90 |
| Wally Ecklund | $150 | Salwa Elshazly | $90 |
| Stephanie Pochop | $125 | | |
| | | Youth Advocate | Rate |
| | | Terry Harrack | $30 |

The Defendants do not object to the reasonableness of these requested rates, except to argue that the rates must be reduced under the PLRA. As explained above, the PLRA does not apply to the Plaintiffs' request for attorney fees.

 In general, the Court has calculated the award of attorney fees according to the rates requested above. Ms. Yee is a paralegal with extensive experience in these types of cases, so her rate of $90 an hour is allowed even though normally this Court would not allow that rate for paralegal work. The rates allowed for the law student work, however, is reduced from $90 an hour to $45 an hour. The reduction to attorney fees based on this decrease in the compensable rate for law student work is $18,814.50. (As explained below, there are further reductions for law student hours that the Court finds were not reasonable.)

■ Based on the rates above, and with some deductions for the reasonableness of hours recorded, the Plaintiffs are entitled a fully compensatory fee award. On the whole, the Plaintiffs' lawyers achieved an excellent result for their clients and for the future residents of Plankinton. In addition, contrary to the Defendants' objection, the requested award will not be reduced on the claim that the Settlement Agreement did not represent a total success for the Plaintiffs. Because this case involved a common core of facts and closely related legal theories, the lawsuit cannot be viewed as a series of discrete claims. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933; *see also Jenkins v. State of Missouri,* 127 F.3d 709, 718 (8th Cir.1997) ("If the plaintiff has won an excellent result, he is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he did not win.") The Court's findings as to the Plaintiffs' success are outlined below.

The Settlement Agreement represents a major victory for the Plaintiffs on the issue of restraints. Under the Settlement Agreement, Defendants must first use non-fixed therapeutic restraints when dealing with suicidal youth and cannot use fixed restraints without approval from mental health personnel and without continued observation of the youth being restrained. In addition, the Settlement Agreement requires Defendants to remove all of the metal rings used for restraints from the beds in Units B, C and D and the Female Secure Unit with the exception of three beds in the crisis cells in the Female Secure Unit. Defendants admit that these practices are new. Defendants argue, however, that the provision in the Settlement Agreement that a juvenile may not be kept in restraints for a minimum fixed period of time is not a new policy but had been adopted by Defendants prior to the Settlement Agreement. Defendants argue that Plaintiffs have not prevailed on this point even though there were instances when this policy was not put into practice because the policy was in place.[1] Even if the Settlement Agreement did not create a new policy, it altered the legal relationship between the parties. Pursuant to the Settlement Agreement, Plaintiffs can now enforce the provisions, making it more likely that these policies would be put into practice.

The Settlement Agreement also contains significant improvements in the mental health services offered by Defendant. Under the Settlement Agreement, Defendants must provide 100 hours per week of clinical mental health care and 16 hours per month of psychiatric care. Defendants argue that this is not a new policy because the state had been contemplating and attempting to implement an increase in mental health care since 1999. The Court is only concerned, however, with the actions the state actually took to improve the conditions at Plankinton. Defendants did hire more mental health professionals. There is no indication, however, that Defendants intended to provide the same minimum amount of hours of mental healthcare. There is also no indication as to when these minimum hours would have been put in place. Thus, the Settlement Agreement may have brought this benefit to Plaintiffs sooner.

Suicide prevention policies are also outlined in the Settlement Agreement. Defendants claim the majority of these policies are not new. For example, Defendants claim they already had a policy in place that required face-to-face intervention with a suicidal youth. This policy was only put into effect two months

---

1. In a related matter, Defendants admit that the Settlement Agreement creates a new poli-cy and practice by prohibiting the use of tethers to escort youth to and from cells.

before a settlement was reached. Defendants also claim the videotaping of youths in restraints had been ordered long before this suit was even filed, as had the requirement that those tapes be reviewed. But Warden Van Vooren admitted in her deposition that the tapes were never actually reviewed. The Settlement Agreement, therefore, provided a means to actually enforce these policies to effect some practical change at Plankinton. In addition, Defendants admit that the record keeping provisions on the use of force are new.

Defendants admit that the Settlement Agreement creates new policies with regard to cell confinement and the disciplining of youths. Contrary to Defendants' prior policy, the Settlement Agreement allows staff to enter a youth's cell for the purpose of employing verbal de-escalation techniques. The Settlement Agreement also limits the use of chemical agents and cell entry uniforms to extreme situations of aggressive and assaultive behavior. Defendants claim that this is consistent with their pre-existing policy and that only minor adjustments were made to that policy after the implementation of the Settlement Agreement. This "minor" adjustment, however, was actually to specify that chemical agents could not be used unless a youth was threatening "imminent" bodily harm to himself or others. Given the examples of the use of chemical agents in the past, this is a significant change.

In addition, the Settlement Agreement provides Plaintiffs with certain enforceable due process rights. For example, when a youth is placed in administrative detention, that confinement must be reviewed every 24 hours and may not exceed 72 hours. In addition, the Settlement Agreement provides that the youth must be given an explanation of the reason for his confinement and eventually given a hearing with certain due process rights and a right to appeal. The Settlement Agreement also limits the amount of time a youth may be confined if the youth is found to have violated any rules or regulations. Defendants claim these policies do not differ greatly from their past policy which is now embodied in Department of Corrections Policy 3D.4. Policy 3D.4, however, was not officially changed until a month after this Settlement Agreement was filed with the Court.

The Settlement Agreement also covers training of staff at Plankinton. The Settlement Agreement notes that Defendants had made changes in this area prior to the Settlement Agreement. The Settlement Agreement does add, however, certain other crucial areas for training: interpersonal relations, social/cultural lifestyles of the juvenile population, and cultural diversity. These are particularly important areas given the cultural diversity of the youths coming into Plankinton and given the fact that Defendants past policies treated the youths more like adult offenders than juvenile delinquents.

Defendants also admit that the Settlement Agreement reflects a change in policy regarding mail, to the extent it prevents the reading of all incoming non-privileged mail which was being done as a matter of course.

There are some parts of the Settlement Agreement that codify changes that were already under way. For example, "less-than-lethal" tools were taken out of Plankinton in August 2000, prior to the Settlement Agreement. Also, it appears that Defendants may have begun to comply with the requirements of IDEA shortly before the Settlement Agreement. Similarly, the policy regarding telephone calls that is reflected in the Settlement Agreement, began during the litigation. Still, the most important result of the Settlement Agreement—the alteration of the

legal relationship between the parties—applies both to those matters that represented a significant change in policy and to those that merely codified existing policy. The Plaintiffs may now move to enforce these measures that would better serve them without having to hit a moving target.

Defendants have challenged the reasonableness of seven general areas of the Plaintiffs' request for fees and expenses: (1) overstaffing, (2) consultations between co-counsel, (3) failure to identify issues, (4) meeting with the media, (5) secretarial work, (6) drafting initial pleadings, (7) excessive expenses. These objections are discussed below.

### 1. *Overstaffing*

Hours spent by lawyers or non-lawyers as the result of overstaffing have not been "reasonably expended." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Defendants argue that Plaintiffs' lawyers duplicated their efforts in interviewing youths and the parents, preparing for depositions, traveling to and from depositions, and in taking and/or appearing at depositions.

█ The Court generally agrees with the Defendants that it was not necessary for more than one lawyer for the Plaintiffs to attend or take depositions, and the attorney fees will be reduced accordingly. In general, where the fee request shows that a particular lawyer took a deposition, Plaintiffs will be reimbursed at that lawyer's hourly rate, and no other attorney fees will be allowed. The exception is that fees will be awarded for time spent by local counsel attending the depositions of Warden Van Vooren, Superintendent Spurrell, Secretary Bloomberg, and Governor Janklow, which the Court finds was reasonable preparation for trial. In all other cases where opposing counsel was taking the deposition, the reimbursement will be at the hourly rate of the highest-billing lawyer for the Plaintiffs who attended the entire deposition.

In support of their fee request, Plaintiffs' lawyers assert that the time recorded interviewing youths and parents as well as the time spent preparing for depositions was devoted to separate interviews and depositions. The Court credits this statement. Except where it is obvious from the fee request that more than one lawyer interviewed a youth or parent or prepared for a deposition, the Court will not adjust attorney fees downward for that time. In instances where more than one lawyer prepared for a deposition, fees will be awarded based on the hourly rate of the highest-billing Plaintiffs' lawyer who attended the deposition or, if another lawyer actually took the deposition, the lawyer who took the deposition.

Similarly, Plaintiffs seek attorney fees for multiple attorneys appearing at oral argument on the motion for class certification, at a status conference, and at the fairness hearing. They also seek attorney fees for multiple attorneys being present during conferences or teleconferences with defense counsel. With respect to such items, the Court will only award fees for the highest-billing Plaintiffs' attorney in attendance and, in the case of court hearings (including telephonic hearings), for the presence of one local counsel.

The additional reduction in fees for duplication of effort is $32,779.

### 2. *Consultations Between Co–Counsel*

Plaintiffs also seek fees for time spent in conference with each other—including conferences between lead counsel in Maryland and local counsel in South Dakota. The Court recognizes that time spent by multiple attorneys in conference with each other can be the product of careful and reasonable preparation, *see Rodriguez–Hernandez v. Miranda–Velez*, 132 F.3d 848, 860

(1st Cir.1998), and that local counsel was to some extent involved in assisting with the merits of the case. Nonetheless, many of the meetings between lead counsel and local counsel were overstaffed by lead counsel. In instances where too many lead lawyers participated in meetings or conferences, the hours have been reduced to correspond to the highest-billing lead counsel. In instances where lead counsel were discussing with each other discovery strategy, trial strategy, or the possibility of settlement, the hours expended appear to be reasonable, and will not be reduced.

The additional reduction in fees for unreasonable consultation is $5,101.50.

### 3. *Failure to Identify Issues*

Some of the time records kept by local counsel mention conferences between lawyers but do not indicate what those conferences were about. The Supreme Court has recognized that "counsel should identify the general subject matter of his time expenditures," in order to allow the court to sort out work that was done on successful and unsuccessful claims. *See Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933. In this case, the Plaintiffs' claims were too closely interwoven to sort out the work on this basis, and so the Court will not reduce the fee request for any ambiguity in the subject-matter of the recorded time.

### 4. *Meeting with the Media*

■■■ No attorney fees will be awarded for time spent by local counsel meeting with the media in the February 24, 2000 press conference or for time spent meeting with parents in preparation for that press conference. *See Halderman ex rel. Halderman v. Pennhurst State School & Hosp.,* 49 F.3d 939, 942 (3d Cir.1995). The amount billed in connection with the conference—$3,977.50—will be deducted from the fee request.

### 5. *Secretarial Work*

■■■ Work performed by paralegal assistants or law students that is essentially clerical is not properly part of a fee award. *Spegon v. Catholic Bishop of Chicago,* 175 F.3d 544, 553 (7th Cir.1999). Defendants object to any award for time that Plaintiffs' paralegal assistant or law students spent organizing files, copying documents, or Bates stamping documents. The Court agrees that copying and Bates stamping are administrative tasks, and no fee will be awarded time spent performing these tasks. Similarly, the time spent by counsel Pochop recording a Rule 26 order on everyone's calendar is administrative work that is not compensable.

The Court will allow some of the time spent organizing documents. The Court believes that Ms. Yee, as a trained and experienced paralegal, did more than just administrative work in organizing documents in September 2000, and will allow all of that particular time recorded by her. The Court also believes that the 1.3 hours spent by counsel Mark Schindler was reasonable legal supervision of the ongoing organization of documents and is thus compensable. While the Court finds that the time that law students spent organizing documents was more than just administrative, it finds that too much time was spent on these tasks. Accordingly, there will be a partial award of fees for the time spent by law students. The time spent by the law advocate Harrack and the time spent by Ms. Yee on November 11 appear to be purely administrative and will not result in an award of fees.

The total reduction for time spent performing administrative tasks is $4,117.

### 6. *Drafting Initial Pleadings*

The Defendants object to the time recorded for the 48.35 hours spent drafting the initial pleadings—the Complaint and

Motion for Class Certification. The Complaint and Motion for Class Certification were well drafted, and the Court finds that the time spent preparing them was reasonable. The Plaintiffs are entitled to a fully compensatory fee award for that time.

### 7. *Costs and Expenses*

 Defendants also object to the amount charged by local counsel for sending faxes—$2.00 per page—and for long distance telephone calls—in many cases $5.00 per call even if the call was brief. The Court will allow a flat rate of $.50 per facsimile page and, for phone charges that were apparently billed at a flat rate of $5.00, a flat rate of $2.50 per phone call. The total reduction for facsimiles and telephone calls is $196.50.

The Defendants also object to paying attorney fees for much of Plaintiffs' counsel's travel and for the travel expenses themselves. The Court agrees that some of the time spent traveling was unnecessary. In most instances, it was necessary only for one of Plaintiffs' counsel to travel to South Dakota or Chicago; this was the case for depositions and all of the Court hearings. (Exceptions are for travel spent in the early stages of the case, including the interviews of clients and parents in January 2000, as well as for the travel for the tour of the Plankinton facility.) No fees will be awarded for time spent in unnecessary travel. The Court will, however, allow reimbursement of the out-of-pocket travel expenses for these trips which the Plaintiffs' lawyers expended in good faith. The total reduction for travel time is $26,114.

Defendants also object to expenses totaling $1,200 for "investigation" by State Senator Pat Haley. There has been no showing of what this "investigation" consisted of, and no such expenses will be reimbursed. Had there been a showing of what those expenses were and what the investigation consisted of, the expenses might have been reimbursed, depending upon the showing.

### CONCLUSION

The Plaintiffs, as prevailing parties, are entitled to be compensated for attorney fees and expenses without regard to the provisions of the PLRA. The reduction in the compensable rates for law students totals $18,814.50. The hours requested, moreover, are in some respects unreasonable. The total reduction in attorney fees based on the reduction in compensable hours, in accordance with the discussion above, is $72,864.50. The total reduction in expenses is, in accordance with the discussion above, is $1,396.50. These reductions bring the total awards down to $302,617.50 in attorney fees and $74,019.98 in expenses. Accordingly,

IT IS ORDERED:

(1) that the Motion for Attorney's Fees and Costs is granted in part and denied in part; and

(2) that the Defendants shall pay the Plaintiffs $302,617.50 in attorney fees and $74,019.98 in expenses.